## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

**CARMEN REID**

**VS.**                                                              **C.A. No: 25-41**

**CITY OF PROVIDENCE, by and through**
**its Treasurer, SHOMARI HUSBAND, and**
**MATTHEW BROWN,**
**individually and in his capacity as principal,**
**Vartan Gregorian School; and**
**JAVIER MONTANEZ, individually and in his**
**capacity as Superintendent of Schools**
**and JOHN AND JANE DOES 1-10**
           **Defendant**

### ***COMPLAINT***

### Introduction

1.  This is a Complaint seeking vindication of Plaintiff Carmen Reid's right to advocate for the rights of disabled children pursuant to the First Amendment of the United States Constitution, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act, as well as her rights under the Rhode Island Whistleblowers' Protection Act, R.I. Gen. Laws § 28-50-2(2), as well as her right to be free from tortious interference with her employment. This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. § § 1331 and 1367.

2.  Plaintiff has duly served the City Council of the City of Providence with notice of her claim as mandated by R.I. General Laws. § 45-15-5, but has received no satisfaction.

### Parties

3.  Plaintiff, Carmen Reid, was at all times relevant to this Complaint a Social Worker employed by Defendant City of Providence's School Department.

4.  Defendant City of Providence is a municipal corporation duly organized under the laws of the State of Rhode Island.

1

**Facts**

5.  Plaintiff was first hired as a Social Worker in the Providence School Department in 2014, and was assigned to the Vartan Gregorian Elementary School ("Gregorian Elementary" or "Gregorian").

6.  At the time that Plaintiff was first hired as a Social Worker in the Providence School Department, she had decades of experience as a licensed clinical social worker, including service as a subcontractor for the Rhode Island Department of Children, Youth and Families ("DCYF"), a three-year assignment to Providence School Department through Gateway Health Care Services, and extensive clinical experience in grief and trauma counseling.

7.  At all times during her employment as a Social Worker in the Providence School Department, Plaintiff performed her duties in a satisfactory if not exemplary manner, had incurred no workplace discipline, and had earned the respect and confidence of her colleagues and superiors for her skill, expertise, and judgment.

8.  Plaintiff, a woman of color, had deep family and personal ties with the neighborhood serviced by Gregorian, and was well-respected in the community as a role model and source of help and support for the Gregorian families.

9.  In the beginning of school year 2023-2024, Matthew Brown ("Brown") began working as Principal at Gregorian.

10.  On information and belief, Brown is the stepson of Providence School Department Chief of Staff Scott Sutherland.

11.  Also in the beginning of the 2023-2024, Kaylee Nearan ("Nearan") began working at Gregorian as a Behavior Interventionist.

12.  A Behavior Interventionist assists with providing students with positive behavioral supports, serves as a member of the Student Support Team and School Crisis Team, and

implements behavioral plans that are developed by licensed and/or certified clinical personnel.

13. In the Providence School Department, the Behavior Interventionist works under the supervision of a Board Certified Behavior Analyst or "BCBA."

14. Under state regulation, a Rhode Island public school student may not be subjected to physical restraint unless:   1) non-physical interventions would not be effective; and 2) the student's behavior poses a threat of imminent, serious physical harm to self and/or others.

15. Under state regulation, before a child can be subjected to physical restraint, any existing behavioral intervention plan must also have been implemented appropriately, and the child must have failed to respond appropriately.

16. Under state regulation, when a child is subjected to physical restraint, the incidents leading up to the restraint must be reviewed and a determination made as to whether the student requires a behavioral intervention plan or whether an existing plan needs to be modified or adjusted.

17. The purpose of the review referenced in Paragraph 16 is to proactively prevent another situation which would necessitate physical restraint.

18. Pursuant to state law, school personnel engaging in restraint/crisis interventions are required to undergo training.

19. Over the period of September-October, 2023, Plaintiff repeatedly observed that Nearan was not implementing behavioral plans with fidelity and otherwise engaging in conduct that triggered the students, which caused student behavior to escalate to the point of a behavioral crisis that was dealt with by way of physical restraint.

20. Plaintiff had personally observed that both Nearan and Brown were executing the restraint holds improperly, potentially subjecting students to dislocated joints and/or broken bones.

21. Plaintiff attempted to instruct Nearan and Brown on appropriate holds to prevent

3

injuries, but was ignored.

22. Plaintiff was also concerned that Nearan and Brown were resorting to restraint holds when it was not necessary to protect the student and/or others around the student, in violation of state regulations.

23. For example, Nearan and/or Brown would apply restraints because the child fled the classroom, or had "flopped" to the ground, which did not present threats of imminent, serious physical harm.

24. Most if not all of the students affected by Nearan and Brown's improper use of restraint had disabilities as defined by the ADA, Section 504, and/or the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq.

25. Plaintiff also personally observed Nearan and other staff members discussing confidential student information in the hallways, such as health information and/or involvement of the family with the Department of Children, Youth, and Families.

26. Nearan and the other staff members engaged in these discussions in the hallway in the hearing of many others, including but not limited to other students.

27. Nearan and the other staff members engaged in these discussions with individuals who were not working with the students and had no legitimate interest in the information, thus violating their confidentiality under state and federal law governing student records and/or medical information.

28. In at least one instance, Nearan's violation of confidentiality resulted in one disabled student's being subjected to sarcastic, cruel, and potentially triggering remarks.

29. Plaintiff attempted to caution Nearan and the staff members about the confidentiality laws, but went unheeded.

30. In a meeting on or about September 22, 2023, Plaintiff reported the confidentiality

breaches to Brown.

31.  Brown's response was merely to thank Plaintiff for having alerted him to the confidentiality breaches, but the hallway discussions continued unabated.

32.  If anything, the confidentiality breaches got worse because Nearan and other staff members would discuss confidential issues over the walkie-talkies, which could be heard by other staff members with no involvement with the student being discussed.

33.  Also during the meeting of September 22, 2023, Plaintiff reported to Brown her concerns about Nearan's performance with respect to failure to appropriately implement behavior intervention plans, triggering students, inappropriately applying physical restraint, and the impact that Nearan's performance failures had on a safe school environment.

34.  During the meeting of September 22, 2023, or at roughly the same time period, Plaintiff asked Brown for a meeting with Nearan's supervisor, Allison Kinoian and other relevant school staff to address Nearan's performance issues and violations of law.

35.  In addition, at the September 22, 2023 meeting with Brown, Plaintiff also reported violation of the law mandating recess.

36.  Pursuant to R.I. Gen. Laws § 16-22-4.2, all elementary students are to have at least 20 consecutive minutes of unstructured free-play recess each day.

37.  Plaintiff repeatedly saw the mandate of unstructured free-play recess violated, in that some teachers would require students to do homework during recess, or just sit on a rock as punishment for not completing their work.

38.  Plaintiff also observed staff members failing to supervise the students at recess, which was especially problematic because of the homeless encampment adjacent to the school.

39.  Brown thanked Plaintiff for bringing the recess issues to his attention.

40.  Subsequent to the September 22, 2023 meeting, Plaintiff went to Brown again many

times with similar complaints about recess, but he exhibited a lack of interest.

41.  Later, Plaintiff would observe Brown socializing with other teachers on the playground while the children went unsupervised.

42.  Plaintiff attended a meeting with Nearan's supervisor, Allison Kinoian, and Brown at the end of October, 2023, regarding Nearan's performance issues and violations of law.

43.  During that meeting, Nearan's supervisor and Brown demonstrated no interest in the safety issues that Plaintiff was raising, or the potential violations of law.

44.  Plaintiff reported to Brown an incident in mid-to-end of the October, 2023, in which a special education /limited English proficient student was being mistreated.

45.  The student had been kept in for recess because she did not know her letters.

46.  The teacher assistant then "taught" the child by pointing at letters on the board and screaming:  "What is this?" causing the child to become visibly distraught.

47.  Brown dismissed Plaintiff's report of this mistreatment of a special education student.

48.  Also during the fall of 2023, Plaintiff observed that Nearan taking children out of class for what Nearan referred to as "therapy sessions," purportedly to deal with their emotional issues.

49.  Nearan's role as Behavior Inteventionist did not include private sessions with students, nor was Nearan licensed or qualified to conduct "therapy."

50.  Plaintiff reported Nearan's sessions to Brown, and pointed out that Nearan was not licensed or qualified to conduct "therapy," but nothing was done.

51.  By the time that Plaintiff reported Nearan's unlicensed efforts at therapy, it was apparent that Brown and Nearan had a personal relationship.

52.  In early October, Plaintiff reported the ongoing issues of breach of confidentiality to Brown again.

53.  This time, Brown deflected by accusing Plaintiff of fomenting gossip that Brown had

only gotten his job because of his relationship with Scott Sutherland.

54.  In October, 2023, Plaintiff suggested methods to abate the confidentiality issues presented by walkie-talkies, but Brown never implemented those methods.

55.  In October, 2023, Brown put his hands on the back of Plaintiff's shoulder and pushed her towards a door because Plaintiff was trying to explain a conflict between two families.

56.  Plaintiff promptly told Brown to take his hands off her.

57.  Plaintiff, Brown, and other staff members later met and discussed the incident in which Brown had put his hands on her.

58.  Plaintiff reiterated to Brown that he was never to put his hands on her again, stating:  "I know you are a white man on top of the food chain, but you are not going to treat me like this again."

59.  Brown's response was:  "I am well aware I am a white man at the top of the food chain, and I am the Administrator."

60.  In late October, 2023, Plaintiff was at Gregorian with Rhode Island College Assistant Professor, School of Social Work, Dr. Vilna Tejada.

61.  Plaintiff and Tejada witnessed a restraint hold being used on a child during transitions because he had "flopped" to the ground as a protest to switching activities.

62.  In response, Plaintiff reminded Brown that it was improper to resort to physical restraint holds simply because the student was "flopping" to the ground.

63.  As a result of Plaintiff's numerous reports of violation of law and for her advocacy for children with disabilities, Brown began pushing Plaintiff out of a number of roles she had customarily held as school social worker at Gregorian, including but not limited to home visits, calls to parents, crisis interventions, and social/emotional issues.

64.  Plaintiff also learned from Nearan that Nearan was developing behavioral intervention

plans alone, which was outside the scope of her licensure and should have been done by the BCBA.

65. Nearan was also failing to inform staff members and parents of these behavioral intervention plans, which made them ineffective because there was no consistency from one adult to another, and also violated professional and ethical standards for Applied Behavior Analysts as incorporated into state regulation.

66. Plaintiff repeatedly asked Brown why Nearan was doing behavioral intervention plans, and pointed out that she was not licensed or otherwise qualified to do them, but nothing was done.

67. Plaintiff also reported that Nearan was failing to inform staff members and parents of the behavioral intervention plans.

68. Plaintiff learned from a third party that Brown and Nearan were repeatedly eavesdropping outside her door while Plaintiff was holding confidential discussions.

69. Brown also repeatedly would enter Plaintiff's office, without knocking, when Plaintiff was having confidential meetings with parents, or students.

70. Brown also made Plaintiff and other female staff feel uncomfortable by winking at them, patting them on the shoulder and similar gestures.

71. Prior to the holidays, Plaintiff told Brown that his behaviors were making female staff members feel uncomfortable.

72. Brown stopped the behaviors for a short period, but then they resumed.

73. In January, 2024, shortly after the holiday break, Plaintiff learned that Brown instructed Nearan to perform a risk assessment on a child who had expressed suicidal ideation.

74. Nearan was not qualified or licensed to perform those risk assessments.

75. At the beginning of January, 2024, Plaintiff learned that Nearan had given a disabled student with behavioral and aggression issues a "pocket staff" as a reward for good behavior.

76. The pocket staff expanded over three feet and closely resembled an expandable baton,

such as those used by law enforcement.

77.  The "pocket staff" could easily be used as a weapon and therefore was manifestly inappropriate to give to a child with behavioral and aggression issues.

78.  Plaintiff reported this gift to Brown, complete with a picture, but Brown was again dismissive.

79.  When Plaintiff attempted to discuss the matter with Brown, Brown became angry and began questioning the Plaintiff.

80.  Brown's questions were more geared towards finding out whether Plaintiff had initiated contact with the parent about the staff rather than addressing the inappropriate gift of the pocket staff.

81.  On or about January 17, 2024, Plaintiff observed a child care worker (CCW) bringing Student A. to the nurse to be changed.

82.  Plaintiff was aware that Student A. had a history of sexual abuse.

83.  Plaintiff observed Teacher B. unnecessarily brushing his body against Student A. while entering the room.

84.  The Teacher B. attempted to brush his body against Student A. again while leaving the room, but Plaintiff stopped him.

85.  Plaintiff became concerned that Teacher B. was engaging in inappropriate physical contact with Student A., told the CCW to keep child away from this teacher, and reported the matter to Brown.

86.  Brown stated he would talk to Teacher B.

87.  Plaintiff notified Student A.'s DCYF worker of the incident, who asked Plaintiff to report any further episodes.

88.  Shortly after this incident, Nearan and another teacher told Plaintiff that the Student A.

had disclosed sexual abuse by a party other than Teacher B.

89. The teacher and Nearan told Plaintiff that they had asked Student A. detailed questions about the alleged abuse.

90. This questioning was improper, because it could interfere with a police investigation.

91. Plaintiff also learned that Student A. had disclosed the sexual abuse the day before, but neither Nearan nor the teacher had reported the disclosure of sexual abuse to DCYF.

92. Plaintiff told the teacher and Nearan that they should have reported the matter to DCYF as a matter of law, and that they were about to run afoul of the twenty-four hour reporting deadline also established by law.

93. Plaintiff reported the improper interviewing and failure to report to DCYF to Brown, who took no action.

94. On or about January 18, 2024, in a meeting with Brown, Plaintiff again raised the issue of Nearan holding "therapy sessions" with children.

95. Brown stopped Plaintiff, stating that they would discuss the matter later, but that discussion never took place.

96. On or about January 26, 2024, Plaintiff learned from maintenance workers that Teacher B. was having lunch with 4-5 limited English proficient girls who were new to the school and this country.

97. When Plaintiff asked the girls what they had been talking about with Teacher B., the girls immediately "shut down," looked at each other, and would not answer.

98. Because of this unusual behavior, Plaintiff suspected potential inappropriate activity by Teacher B.

99. In addition, in Plaintiff's experience, students with limited English proficiency and/or newcomers to this country are particularly vulnerable to sexual abuse.

100.  Plaintiff brought the situation to Brown, who asked who had told her about the lunches, but otherwise did nothing.

101.  On or about January 29, 2024, Plaintiff witnessed Teacher C. sitting on the rocks on the playground, showing kindergarten students something on his phone.

102.  One little girl was leaning over Teacher C.'s shoulder, and another was laying on his lap.

103.  When Plaintiff approached, Teacher C. closed his phone abruptly and jumped up.

104.  Plaintiff became suspicious about Teacher C.'s behavior, and reported it to Brown. After asking a few questions, Brown simply thanked Plaintiff for letting him know.

105.  At the end of January, 2024, Plaintiff learned that Brown had falsely reported to her supervisor, Natalie Fleming, that Plaintiff was "toxic."

106.  Plaintiff reported to Fleming that was Brown eavesdropping outside her door, and also reported the aforementioned issues regarding inappropriate and unlawful restraints, and violations of confidentiality, and other potential illegal activity.

107.  Plaintiff was in the vicinity of Brown's office when Fleming went to speak to Brown about Plaintiff's reports.

108.  Plaintiff heard Fleming, Brown and another woman screaming from inside the office.

109.  Fleming later called Plaintiff and stated that there would be a meeting about the issues that Plaintiff had reported, and asked if Brown had told her about it.

110.  Brown had not told Plaintiff about any meeting.

111.  Fleming became angry that Plaintiff had not been told about the meeting, and said she would get back to the Plaintiff, but left the district on or about March 15, 2024 before any meeting could be held.

112.  On or about February 8, 2024, Plaintiff reported to Brown that Teacher D. was

11

misusing token economies, and also was discriminating against students based upon race.

113.  Among other things, Teacher D. habitually had a small violin hanging from her lanyard.

114.  The students reported to the Plaintiff whenever a student of color or a limited English proficient student complained, Teacher D. would play the small violin in order to mock them.

115.  Brown did nothing in response to Plaintiff's report, but gave Plaintiff a disdainful look.

116.  In or about February, 2024, Plaintiff learned that Nearan was contacting parents and promising them  special education services and disability accommodations.

117.  As a matter of law, decisions regarding special education services and/or disability accommodations are group decisions of the child's IEP or 504 Team, not individual staff members.

118.  Plaintiff reported Nearan's promises to Brown, as well as the special education supervisor and special education inventionist, but the promises continued.

119.  In or about March, 2024, Plaintiff was scheduled to attend a professional development in the afternoon.

120.  Plaintiff did not get an email rescheduling the professional development to the morning.

121.  On the morning of the professional development, Brown approached her aggressively in the hallway, in the presence of students, teachers, and staff, claiming that he had gotten several calls from downtown reporting that Plaintiff was not in the professional development.

122.  Plaintiff attempted to explain why she was not at the professional development, but Brown continued to behave aggressively.

123.  In or about March 12, 2024, Brown ordered Plaintiff to make a Google Doc to be put on Google Drive, with all of the student in her small counseling groups.

124. Plaintiff expressed concerns that creating and distributing that document would violate confidentiality laws, and said she would need to check with her supervisor

125. Brown continued to approach Plaintiff about the document.

126. Plaintiff got an answer from her supervisor, stating that she could create the document without identifying information.

127. Brown agreed to the document not having identifying information, but became very condescending and demanded that Plaintiff complete the task by the end of the school day.

128. When Plaintiff stated she could not provide the document by the end of the day, Brown became annoyed.

129. On about March 15, 2024, a number of girls came to Plaintiff and reported that the sanitary napkin dispensers were not filled, that they had gone and reported this to Brown, who sent them to a male maintenance worker, who in turn sent the girls back to Brown.

130. The girls finally turned to the Plaintiff, who told Brown that his instruction to go to a male maintenance worker about menstrual products was inappropriate and had made the girls very uncomfortable.

131. On or about March 19-20, 2024, a Gregorian student who was in the care of the DCYF had submitted a letter explaining that child's benefits.

132. Staff member and union building representative Stacey DeMello copied the benefits letter and distributed it to staff with no job-related need for the information contained in said benefits letter.

133. Said benefits letter also contained sensitive information about the other children in the household who were not Gregorian students.

134. When Plaintiff received a copy of the benefits letter, she went to Brown, and complained that the distribution of the letter was a violation of confidentiality.

135.  Plaintiff reasonably believed that the distribution of the letter violated confidentiality laws and potentially exposed the individuals referenced to identity theft.

136.  Brown dismissed Plaintiff's concerns, and became belligerent.

137.  Plaintiff informed Brown that she would be contacting the child's DCYF case worker.

138.  Plaintiff proceeded to inform the DCYF case worker that the letter had been distributed, and informed Brown that she had reported the matter to the DCYF case worker.

139.  A half-hour before school ended for the day on March 20, 2024, Reid was placed on administrative leave with pay.

140.  On information and belief, the day after Reid was put on administrative leave, Nearan changed the sign on her office mailbox to read, "Behavioral Therapist."

141.  By letter dated March 20, 2024 from Executive Director of Labor Relations & Employee Services, the alleged reason for the administrative leave was a pending "internal investigation."

142.  By letter dated May 21, 2024, Plaintiff was summoned to a "Pre-Disciplinary Administrative Hearing."

143.  According to said letter dated May 21, 2024, Plaintiff was charged with numerous false allegations of misconduct, including but not limited to:

- Showing a "combative approach to administration and fellow staff members. These behaviors include but are not limited to refusal to participate in completing document(s) to assist the Support Team's case load and failure to show for district and school professional developments.

- "Negatively and aggressively" addressing other staff members, alleged undermining of staff directly to parents, questioning of staff's qualifications and intelligence in front of students and other staff, and overall creating a hostile work environment for the community of the school."

144.  At no time was the Plaintiff provided with the specifics of any such alleged charges

14

of misconduct prior to the Pre-Disciplinary Administrative Hearing.

145.  The charges were made with knowledge of their falsity.

146.  Said Pre-Disciplinary Administrative Hearing was held on June 12, 2024.

147.  Among those in attendance at said June 12, 2024 Pre-Disciplinary Administrative Hearing were Brown, school district attorney Charles Ruggerio, Union attorney John DeSimone, and the Plaintiff.

148.  Immediately prior to the June 12, 2024 Pre-Disciplinary Administrative Hearing, Plaintiff observed Brown talking and laughing with a man that she later learned was Scott Sutherland.

149.  At said June 12, 2024 Pre-Disciplinary Administrative Hearing, Plaintiff was questioned about having missed the professional development, specifically, the fact that she had not received the email rescheduling Plaintiff from the afternoon session to the morning session.

150.  Plaintiff explained the reasons for having missed the professional development.

151.  At said June 12, 2024 Pre-Disciplinary Administrative Hearing, Ruggerio questioned Brown about the missing professional development, but Brown could not provide answers or documentation.

152.  Ruggerio then questioned Plaintiff about her alleged "aggressiveness."

153.  Plaintiff denied having behaved in an aggressive or otherwise inappropriate fashion, but discussed her concerns about potential violations of law.

154.  Plaintiff and DeSimone were then briefly excused from the Pre-Disciplinary Administrative Hearing.

155.  When instructed to return to the Pre-Disciplinary Administrative Hearing, Ruggerio asked Plaintiff if she had ever told a parent not to speak to Brown or Nearan because they were white and did not know what they were doing.

156. Plaintiff denied the allegation that she had ever told a parent not to speak to Brown or Nearan because that they were white and did not know that they were doing, and pointed out her advocacy for white students in the past.

157. It was clear from the timing of the accusation that the allegation had come from Brown.

158. By letter dated September 5, 2024 from Chief Talent Officer Herman James, Plaintiff was informed that the charges against her had been "administratively closed."

159. The second letter was signed by Superintendent of Schools Javier Montanez, and notified Plaintiff that she was being involuntarily transferred, and must report to her new split position between the Asa Messer Elementary School and the Veazie Elementary School.

160. A split position is a less favorable position because the incumbent must divide her time between two separate locations, and is generally given to staff members who have just begun employment in the District and lack seniority.

161. Plaintiff's working conditions at Messer and Veazie are substantially inferior to those she experienced at Gregorian.

162. For example, Plaintiff's office at Messer, at which she spends 60% of her time, is an old utility closet with no windows, and stale air.

163. At Veazie, where Plaintiff spends 40% of her time, she is required to share a desk, and has no outside telephone access, and no place to meet privately and confidentially with any students.

164. When Plaintiff asked for phone access at Messer, she was told she could make calls in the principal's office or other open office space, which makes her job and maintenance of confidentiality substantially more difficult.

165. Defendants Brown and Montanez colluded in arranging Plaintiff's transfer in order

to retaliate against her for having reported suspected violations of law and/or for advocating for students with disabilities.

166.  The sole reason for the involuntary transfer was to retaliate against the Plaintiff for having reported violations of law and advocated for the rights of disabled children.

167.  On or about September 19, 2024, Plaintiff, through her Union, filed a grievance regarding her involuntary transfer.

168.  Said September 19, 2024 grievance also contained a complaint regarding the harassment and retaliation to which Plaintiff had been subjected during the 2023-2024 school year.

169.  The Providence School District has failed to make any finding on Plaintiff's complaint of harassment and retaliation.

170.  On information and belief, Nearan is working with the School Psychologist, and has been permitted to conduct suicide risk training for which she is not qualified or licensed.

## <u>COUNT I -- WHISTLEBLOWERS' PROTECTION ACT</u>

171.  Plaintiff realleges those allegations contained in the Paragraphs above as if fully restated therein.

172.  Defendant City of Providence is an "employer" as that term is defined pursuant to R.I.G.L. § 28-50-2(2).

173.  Plaintiff reported suspected violation of law and/or refused to participate in violation of law regarding confidentiality, student restraint, assault, and other matters.

174.  Plaintiff's actions in reporting suspected violations of law, and/or refusing to participate in the same, were done in good faith belief that a violation of law had occurred or would occur, and constituted protected activities pursuant to R.I.G.L. § 28-50- 1 *et seq.*

175.  Plaintiff suffered adverse employment actions, in that, among other things, she was subjected to a hostile work environment, falsely accused of wrongdoing and transferred to a substantially less advantageous job assignment.

176.  The reasons stated for the adverse employment actions against Plaintiff were pretextual.

177.  The adverse employment actions were motivated by animus towards Plaintiff for having reported said suspected violations of law and/or refusing to participate in violations of law.

178.  As a direct and proximate result of the wrongful actions of Defendant, Plaintiff suffered adverse employment actions, as well as other financial and reputational harm, as well as emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

179.  Said actions of Defendant were wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiff demands judgment against the Defendant City of Providence, including but not limited to compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

## COUNT II
## SECTION 504 OF THE REHABILITATION ACT and
## AMERICANS WITH DISABILITIES ACT
### (Retaliation)

180.  Plaintiff re-alleges those averments contained in the Paragraphs above as if fully re-stated herein.

181. Section 504 of the Rehabilitation Act and the Americans with Disabilities Act prohibit retaliation for the exercise of protected conduct, including advocacy for the rights of individuals with disabilities.

182.  Plaintiff engaged in protected activity by advocating for the rights of students with disabilities within the meaning of both Section 504 and the ADA, by advocating for disabled students' needs, including but not limited to the right to be free from unlawful restraint, receiving services from unlicensed and unqualified personnel, and violation of the right to confidentiality.

183.  Plaintiff's protected activity was a substantial or motivating cause of retaliatory action against her and by the Defendants City of Providence, Matthew Brown, and Javier Montanez.

184.  This retaliation took the form of, among other things, creating a hostile work environment for Plaintiff, falsely accusing her of misconduct, and transferring her to a substantially less advantageous job assignment.

185.  As a direct and proximate result of the wrongful actions of Defendants, Plaintiff has suffered financial harm, as well as emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

186.  Said actions of Defendants were done with conscious disregard to Plaintiffs' legal rights.

187.  Said actions of Defendants were wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiff demands judgment against Defendants, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

## COUNT IV – 42 U.S.C. § 1983 (First Amendment Retaliation)

188.  Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

189. The First Amendment of the United States Constitution guarantees the right to free speech and to petition for redress of grievances.

190. Plaintiff attempted to exercise her right to free speech and to petition for redress of her grievances and advocate for disabled children.

191. Plaintiff's speech and petition efforts were on matters of public concern.

192. Defendants, acting under the color of state law, unlawfully retaliated against Plaintiff for having exercising her right to petition for redress of grievances.

193. Said retaliation took the form of, among other things, creating a hostile work environment for Plaintiff., falsely accusing her of misconduct, and transferring her to a substantially less advantageous job assignment.

194. The Defendant City of Providence failed to train, supervise, and discipline Defendant Brown and Defendant Montarez, and thus permitted them to be in a position to violate the Plaintiff's constitutional rights.

195. The Defendant City of Providence, being aware that Defendant Brown and Defendant Montanez were engaged in a course of retaliatory conduct against Plaintiff and failing to train, supervise, and discipline Defendant Brown and Defendant Montanez, acted with deliberate indifference towards the Plaintiff's constitutional rights.

196. As a result of a conscious policy, practice, custom or usage, the Defendant City of Providence has permitted and allowed harassment based upon exercise of First Amendment rights.

197. As a direct result of the actions of Defendants, Plaintiff has suffered and will continue to suffer financial harm, emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

198. Said actions of Defendants were done with conscious regard for the legal rights of

Plaintiff.

199.  Said actions of Defendants were wicked, wanton, and for the good of society must be punished.

WHEREFORE, Plaintiff demands judgment against Defendants, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

## COUNT V --
## TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE

200.  Plaintiff incorporates the averments made in the preceding Paragraphs as if fully restated therein.

201.  Plaintiff derived economic advantage as a result of her employment by the City of Providence.

202.  Plaintiff had an expectation of continued employment with the City of Providence.

203.  Defendants Brown and Montanez knew or should have known of the economic advantage derived by Plaintiff from her employment.

204. Defendant Brown and Montanez willfully and deliberately interfered with the economic advantage derived from Plaintiff's employment.

205.  Defendants Brown and Montanez used improper means, and had improper motives in tortuously interfering with Plaintiff's employment.

206.  As a direct and proximate result of the illegal activity of Defendants  Brown and Montanez, Plaintiff has suffered and will continue to suffer damages, including pecuniary and non-pecuniary losses, attorney's fees and costs.

207.  The actions of Defendants Brown and Montanez were willful, malicious, wicked, and

wanton and for the good of society must be punished.

WHEREFORE, Plaintiff demands judgment against Defendants, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

Plaintiff
By her attorneys,


/s/ Stephen M. Robinson
Stephen M. Robinson #2103



/s/ Vicki J. Bejma
Vicki J. Bejma #6498
Robinson & Clapham
123 Dyer Street, Suite 135
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
vbejma@smrobinsonlaw.com